UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                            :

UNITED STATES OF AMERICA,        :

                            :

                            :             25-CR-40 (VSB)

             - v -          :

                            :          **OPINION & ORDER**

JALEN TEAGUE, *et al.*,        :

                            :

            Defendants.  :

                            :

-------------------------------------------------------X

VERNON S. BRODERICK, United States District Judge:

Before me are the motions filed by defendants Megan Sterngast ("Sterngast") and

Cheleia Council Sanders ("Sanders") for severance of their trials from the trial of their co-

defendant Jalen Teague ("Teague"), pursuant to Federal Rule of Criminal Procedure 14(a).

Because I find that there is a substantial risk that Sterngast will be prejudiced from a joint trial

with Teague and there is a serious risk that a joint trial would compromise her trial rights,

Sterngast's severance motion is GRANTED.  However, because Sanders will not suffer

prejudice from a joint trial with Teague, Sanders' severance motion is DENIED.

## I.      **Background and Procedural History**

On January 31, 2025, the Government filed a one-count indictment charging Teague,

Sanders, Sterngast, and Summer Caster with conspiracy to distribute controlled substances

resulting in death.  (Doc. 3.)  The Government filed a three-count superseding indictment on

February 10, 2026, charging (1) Teague and Sanders with Racketeering Influenced and Corrupt

Organization ("RICO") conspiracy, ("Count One"); (2) Teague with murder in aid of

racketeering, ("Count Two"); and (3) Teague, Sanders, and Sterngast with conspiracy to

distribute controlled substances resulting in death, ("Count Three").  (Doc. 52.)

The Government filed the current three-count superseding indictment on February 26, 2026, charging Teague and Sanders with RICO conspiracy, ("Count One"); Teague with murder in aid of racketeering ("Count Two"), and Teague, Sanders, and Sterngast with conspiracy to distribute gamma hydroxybutyric acid ("GHB") resulting in death ("Count Three").  (Doc. 56 ("Superseding Indictment").)  Count Two carried the potential penalty of death.  18 U.S.C. 1959(a)(1) (those convicted under this statute "shall be punished . . . for murder, by death or life imprisonment").

On March 16, 2026, Sterngast filed her severance motion.  (Doc. 57 ("Sterngast Mem.").)  Sanders filed her severance motion on March 27, 2026.  (Doc. 64 ("Sanders Mem.").)  The Government filed its consolidated opposition to the severance motions on April 13, 2026.  (Doc. 66 ("Govt. Mem.").)  Sterngast filed a reply on April 20, 2026.  (Doc. 70 ("Reply").)[1]

I held oral argument on the motion on April 27, 2026.[2]  During oral argument I asked whether counsel for Sanders and Sterngast intended to file any other pretrial motions.  (Tr. 54:25-56:3.)  By letter dated May 14, 2026, counsel for Sterngast informed me that they "do no[t] [sic] intend to file any pretrial motions on behalf of Megan Sterngast."  (Doc. 71.)  On the next day, counsel for Sanders informed me that "[b]ased on the government's exchange of Rule 16 material thus far, Ms. Sanders does not intend to file any motions at this stage."  (Doc. 72.)

By letter dated May 21, 2026, the Government informed me that "the Office of the Attorney General has directed the Government not to seek the death penalty against defendant Jalen Teague" in the instant case.  (Doc. 73 (emphasis omitted).)  Therefore, if Teague is

---

[1] Sanders did not file a reply.

[2] "Tr." refers to the transcript of the oral argument held on April 27, 2026.

convicted of the charge contained in Count Two, he will not face the death penalty.

## II. Applicable Law

Rule 8 of the Federal Rules of Criminal Procedure provides, in pertinent part:

(a) Joinder of Offenses. The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

(b) Joinder of Defendants. The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Rule 14(a) of the Federal Rules of Criminal Procedure provides that:

If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. Rs. Crim. P. 8; 14(a). Therefore, even when distinct offenses are properly joined under Rule 8, "the court may order separate trials or grant a severance under Rule 14 if it appears that the defendant is prejudiced by the joinder." *United States v. Werner*, 620 F.2d 922, 928 (2d Cir. 1980).

There is a preference in the federal system for joint trials of defendants who are indicted together, because "[t]hey promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (quoting *Richardson v. Marsh*, 481 U.S. 200, 210 (1987)). A defendant seeking severance pursuant to Rule 14(a) must meet the heavy burden of showing "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id*. at 539. Indeed, a defendant

seeking to overturn such a finding must demonstrate "prejudice so severe that his conviction constituted a miscarriage of justice," and that "the denial of his motion constituted an abuse of discretion." *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993). Therefore, it is appropriately difficult for defendants to show that spillover "prejudice" from a joint trial can justify severance. *See United States v. Vanwort*, 887 F.2d 375, 384 (2d Cir. 1989) ("A defendant raising a claim of prejudicial spillover bears an extremely heavy burden." (quoting *United States v. Friedman*, 854 F.2d 535, 563 (2d Cir. 1988))). Indeed, even if a defendant is somehow prejudiced by joinder, that prejudice must be "sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." *United States v. Lanza*, 790 F.2d 1015, 1019 (2d Cir. 1986) (quoting *United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir. 1984)). "When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary;" however, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539 (citing *Richardson*, 481 U.S. at 211). "Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts." *Id*. at 541.

## III. <u>Discussion</u>

### A. *Sanders Fails to Establish Prejudice*

Sanders argues that "[t]he presence of death-eligible Count Two, which names only Mr. Teague, and the differing roles alleged against him in the remaining counts—frame the basis for Ms. Sanders' request for severance." (Sanders Mem. 1.) Specifically, Sanders argues that severance is warranted because (1) the delay that commonly occurs in capital cases due to extended pre-trial proceedings "will deprive Ms. Sanders of her fundamental right to a speedy trial," and (2) she will suffer "spillover prejudice" in a joint trial where Teague faces the possible

penalty of death.  (*Id*.)

Teague no longer faces the death penalty.  On May 21, 2026, the Government informed me that the Attorney General had directed it "not to seek the death penalty against defendant Jalen Teague." (Doc. 73.)  Therefore, delays associated with death penalty cases will not be a factor in this case, and the potential that Sanders' speedy trial rights will be compromised due to the death penalty has been removed.

With regard to any spillover prejudice, Sanders and Teague are both charged in Count One with RICO conspiracy and Count Three with conspiracy to distribute GHB resulting in death.  (Superseding Indictment.)  As an initial matter, Sanders does not cite in her motion papers and did not identify during oral argument any case where a court granted severance to a defendant who was charged with RICO conspiracy but was not involved in a murder alleged to have been committed by another member of the RICO conspiracy.  (Tr. 51:3-52:1.)  I too have not been able to locate such a case.  This is not surprising because evidence admitted against one member of the RICO conspiracy would be admissible against other members of the conspiracy even if they were not involved in the act in question.  *See United States v. DiNome*, 954 F.2d 839, 843 (2d Cir. 1992) ("The evidence of the [enterprise's] various criminal activities was, therefore, relevant to the RICO charges against each appellant . . . because it tended to prove: (i) the existence and nature of the RICO enterprise and (ii) a pattern of racketeering activity on the part of each defendant by providing the requisite relationship and continuity of illegal activities."); *Friedman*, 854 F.2d at 563 (where defendant is a "fully implicated conspirator," in a RICO conspiracy, then "most of the evidence of which he complains would have been admissible against him in a separate trial as acts of co-conspirators in the furtherance of a conspiracy").

Here, the superseding indictment alleges that "[t]he purposes of the Teague Enterprise included": "(1) the distribution of narcotics and controlled substances, including [GHB]; (2) robberies; (3) interstate transportation of stolen property; (4) fraud and related activity in connection with identification documents and access devices; and (5) transportation of individuals in interstate commerce to engage in prostitution." (Superseding Indictment ¶ 5.) The "means and methods" of the Teague Enterprise included robbing and drugging victims, actions which were sometimes carried out by Sanders, but sometimes by other members of the Teague Enterprise. (*Id.* ¶ 6.) All of this evidence is admissible as evidence of the existence of the enterprise, the relationship among the members of the enterprise, and evidence of the RICO conspiracy. *See DiNome*, 954 F.2d at 843. Moreover, as noted, Sanders is alleged to have participated in drugging and robbing victims herself, so Sanders cannot argue that conduct by other enterprise members is more shocking or heinous than her own conduct. *United States v. Vebeliunas*, 76 F.3d 1283, 1294 (2d Cir. 1996) (finding no prejudicial spillover when "there was little or no evidence pertaining to the RICO count that was not also admissible with respect to the remaining counts of the indictment, and none of it was particularly inflammatory"). Teague as the leader of the enterprise is alleged to have been involved in all of the robberies committed by the enterprise. (Superseding Indictment ¶ 6.) Evidence of all robberies committed by the enterprise would be admissible against that other members of the enterprise even if they did not participate in some of the robberies, including Sanders. Sanders does not argue that any of this evidence is inadmissible, but merely that it "will have little probative value" as to her "alleged conduct." (Sanders Mem. 5.)

When murder evidence is "crucial to the government's proof and there was no suggestion that the defendant[] committed any of the murders at issue," it is not unduly prejudicial and

properly admissible under Rule 403. *United States v. Brady*, 26 F.3d 282, 288 (2d Cir. 1994).

Therefore, Teague's participation in the murder of Stanley Stark is also admissible against

Sanders as evidence of the RICO conspiracy. *See United States v. Diaz*, 176 F.3d 52, 103 (2d

Cir. 1999) (evidence of eight murders in which the defendant was not involved "would have

been admissible against all of these defendants even if each had been tried separately" because it

tended to prove their RICO enterprise and a pattern of racketeering activity). The case law is

clear that the fact that some members of a RICO conspiracy have been less involved than other

RICO defendants does not warrant severance. *United States v. Chang An-Lo*, 851 F.2d 547, 557

(2d Cir. 1988) ("[D]iffering levels of culpability and proof are inevitable in any multi-defendant

trial and, standing alone, are insufficient grounds for separate trials." (quoting *United States v.

Carson*, 702 F.2d 351, 366–67 (2d Cir. 1983)). This is the case even when the crimes that the at-

issue defendant is not involved with rise to the seriousness of murder or attempted murder. *See

United States v. DeVillio*, 983 F.2d 1185, 1192 (2d Cir. 1993) (evidence of "attempted murder"

by RICO coconspirators not "inflammatory and prejudicial" when appropriate limiting

instruction given); *United States v. Delgado*, 972 F.3d 63, 81 (2d Cir. 2020), *as amended* (Sept.

1, 2020) (finding that evidence of a "retaliatory shooting," which "failed to establish [the

defendant's] liability as an accomplice to murder" was not too prejudicial to be admitted if

appropriate limiting instructions were given because "it certainly illustrated his knowledge of,

agreement to, and participation in the Gang's criminal objectives").

Therefore, Sanders's severance motion is DENIED.

### B. *The Prejudice to Sterngast From a Joint Trial With Jalen Teague Warrants Severance*

Sterngast is only charged with participating in the conspiracy to distribute GHB resulting

in death. (Superseding Indictment ¶¶ 15–18.) Although the narcotics conspiracy does allege that

Stanley Stark's death was a result of the narcotics conspiracy, Count Three does not contain allegations related to robbery, transportation of individuals in interstate commerce to engage in prostitution, fraud and related activity in connection with identification documents and access devices, and interstate transportation of stolen goods. (*See id.*) Therefore, evidence related to Mr. Stark's death is likely admissible against Sterngast. *See United States v. Sica*, 676 F. App'x 81, 84 (2d Cir. 2017) (summary order) (noting that "every court of appeals to have considered the question" has rejected the syllogism that a death resulting from a drug dealing conspiracy must be foreseeable in order to be relevant to that conspiracy) (collecting cases).

However, the predicate act evidence related to Count One falls into a different category. The Government claims that evidence of some of the predicate acts is admissible against Sterngast although "not as proof of predicate acts in the RICO conspiracy, but as proof of how the conspiracy that she was a part of worked." (Tr. 28:6-11.) However, the Government also acknowledged that there is no evidence that Sterngast was aware of the credit card use, or interstate transportation of stolen property, to take two examples, (*id.* at 28:12-20), that formed part of the RICO conspiracy, but not the conspiracy undergirding Count Three.

The Government appears to argue that evidence of the predicate acts was part of or taken to further the narcotics conspiracy. However, "[a] defendant who participates in jointly-undertaken narcotics activity is to be held accountable for the reasonably foreseeable conduct of others in furtherance of that activity." *Rosa*, 11 F.3d at 343. "Whether a particular crime is foreseeable and in furtherance of the conspiracy is a factual matter for the jury." *United States v. Romero*, 897 F.2d 47, 51 (2d Cir. 1990) (citing *United States v. Bruno*, 873 F.2d 555, 560 (2d Cir. 1989)). Therefore, as a legal matter it is not clear to me that some or all of the acts of members of the Teague Enterprise, in particular the crimes they committed that form the

predicates for the RICO conspiracy, would be admissible against Sterngast in a separate trial under facts presented here.

Sterngast is not charged with being a participant in the RICO conspiracy. The predicate acts committed by the members of the Teague Enterprise, with the exception of the narcotics conspiracy itself, do not appear to be in furtherance of the narcotics conspiracy. At the hearing I inquired of the Government what caselaw supported their argument that I should deny Sterngast's severance motion even though many of the acts that would be admissible against Teague and Sanders at trial were likely not reasonably foreseeable to Sterngast and thus would not be admissible against her. (Tr. 41:4-42:3, 47:7-49:22, 60:11-22.) The Government explained that it primarily relies on *United States v. DeVillio*, 983 F.2d 1185 (2d Cir. 1993), *United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993), *United States v. Muyet*, 945 F. Supp. 586, 596 (S.D.N.Y. 1996), and *United States v. Reid*, 650 F. Supp. 3d 182 (S.D.N.Y. 2023). I find each of these cases to be distinguishable, since they involved acts, including acts of violence, committed by members of a narcotics conspiracy or RICO charge to further the conspiracy or enterprise.

For example, in *Rosa*, although the defendants who sought severance "personally were not charged with acts of violence" there was "ample" evidence "that each of them was an integral part of the conspiracy" to purchase drugs and weapons for the RICO organization, and "[s]ince the evidence was that the Organization's routine modus operandi involved the use of murder and mayhem to exclude competitors from its retail drug spots and to maintain discipline among its members, the acts of violence performed by other coconspirators were chargeable to [the defendants], and their claims of prejudicial spillover must be rejected." 11 F.3d at 341–42. Here, in contrast, there is no evidence of Sterngast having a similarly "integral" role in the activities of the Teague Enterprise.

9

Similarly, in *Reid*, Judge Philip M. Halpern denied the severance motion of a defendant charged with RICO conspiracy and noted that, "[w]here, as here, each defendant is alleged to be a member of a single conspiracy, 'virtually all of the evidence admitted at a joint trial would be admissible against each separate defendant in a separate trial as acts of his co-conspirators in furtherance of the charged conspiracy.'" 650 F. Supp. 3d at 198 (quoting *United States v. Jimenez*, 824 F. Supp. 351, 368 (S.D.N.Y. 1993)). The defendant seeking severance in *Reid* was much more similarly situated to Sanders than to Sterngast, since that defendant was a member of the RICO conspiracy charged, *id.* at 198, but had no involvement in some of the predicate acts of violence constituting the conspiracy. The court in *Reid* held that "all of the acts of violence alleged to have been committed by his co-defendants would be admissible as proof of the existence and nature of the narcotics and racketeering conspiracies." *Id.* (internal quotation marks omitted and alterations adopted).

In *Muyet*, although the defendant was not alleged to have been part of the RICO conspiracy in the case, 945 F. Supp. at 595–96 ("Delvalle is not charged as a member of the RICO enterprise or the RICO conspiracy, nor is he charged with any of the violent offenses"), he was purported to have been a member of a narcotics conspiracy that "engaged in brutal acts of violence to maintain discipline within the conspiracy and to force out competitors," and "was aware of and benefitted from the gang's violent activities" thus, "[t]he evidence which Delvalle objects to as prejudicial spillover would be admissible in a separate trial against him because it tends to prove the existence and nature of the narcotics conspiracy," *id.* at 597. Not so here, where Sterngast is only alleged to have supplied drugs to the Teague Enterprise. The Government has not established that Sterngast was the sole or exclusive supplier, (Tr. at 31:12-35:7), and Sterngast argues that the predicate acts were not part of the narcotics conspiracy, and

that members of the Teague Enterprise "were not in [the] drug distribution business, they were in the robbery business," (*id.* at 35:8-36:11).

*DeVillio* presents a somewhat closer analog, as, there, the Circuit affirmed the denial of severance motion brought by two defendant members of a burglary ring who were involved in the transportation of stolen goods related to a commercial burglary on the basis that they were not involved in the attempted murder of "a licensed locksmith involved in the burglary ring who subsequently cooperated with local law enforcement officials." 983 F.2d at 1192–93. There, the at-issue defendants were not charged with being a part of the RICO conspiracy and were only charged with participation in an earlier burglary that was part of the burglary ring's pattern of criminal activity. *Id.* at 1187. However, unlike here, *DeVillio* did not involve two independent conspiracies with separate purposes, one more limited and one broader in scope. Because such a set of overlapping conspiracies presents itself here, the juxtaposition of the arguably limited conspiracy to deal drugs charged against Sterngast and the RICO conspiracy that involved a myriad of criminal acts involving Sanders, Teague, and other members of the Teague Enterprise is likely to confuse the jury and result in spillover prejudice.

Further, the attempted murder in *Devillio* had a closer connection to the charges against the defendants seeking severance than the predicate acts evidence does here. The burglary that the appealing defendants committed was at the heartland of the criminal activity alleged in *Devillio* and there was evidence that the defendants who sought severance were also involved in other burglaries with a racketeering defendant. *Id.* at 1188 ("Evidence obtained from two co-conspirators [] linked appellants [] to other burglaries that were tied to racketeering defendant []"). The act of violence was done by the co-defendant members of the burglary ring in furtherance of the RICO conspiracy against an informant on that ring. *Id.* at 1187. In this case,

although the Government alleges that the distribution of GHB was one of the purposes of the Teague Enterprise, (Superseding Indictment ¶ 5), none of the means and methods of the Teague Enterprise identified in the indictment, although facilitated through the distribution of GHB, actually appear designed to further the sale or distribution of GHB charged in Count Three. (*Compare* Superseding Indictment ¶ 6 *with id.* ¶ 16 ("[T]he defendants, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance").)

Moreover, the Government concedes that there is no evidence that Sterngast was aware of the credit card use by members of the enterprise, and that there is no direct evidence that Sterngast was aware of the interstate transportation of stolen property perpetrated by members of the enterprise. (Tr. 28:6-29:3.) Instead, the Government intends to argue that certain evidence supports an "inference" that Sterngast was aware that members of the Teague Enterprise were using the GHB she was supplying to drug and rob men of their property, including credit cards, which was then transported interstate and, subsequently, members of the enterprise attempted to use the stolen credit cards. (*Id.*) During oral argument, I engaged in the below colloquy with the Government:

> The Court: [I]s the government saying that even in a separate trial with regard to Ms. Sterngast, you're going to get in the credit card stuff and get in the interstate transportation of stolen materials items, you're going to get in all the robberies, you're going to get in all of that stuff . . . or you are going to seek to get it in?
>
> The Government: There may be less, frankly, of the first two things you mentioned, and there may be a little less of the robberies than there would be at a joint trial, but there will be a significant amount of it, there will be some of it. Ms. Sterngast was a very significant supplier of GHB to the conspiracy for months, during which dozens of robberies were committed, and that would be part of the evidence at her trial.

(Tr. 30:15-31:11.)  In other words, the Government concedes that in a separate trial for Sterngast they would seek to admit less evidence related to stolen credit cards, interstate transportation of stolen goods, and robberies.[3]  This supports a conclusion that there is a real risk of spillover prejudice to Sterngast that merits severance.  *United States v. Burke*, 789 F. Supp. 2d 395, 399 (E.D.N.Y. 2011) (granting severance when "the overwhelming evidence that will be offered in the prosecution of a joint trial [] will not be admissible" in a separate trial of individual charged with "two counts that are both limited in scope and in time" as opposed to co-defendants who "are charged with participating in comparatively violent criminal acts").  In the same vein, because "the proof required to sustain a conviction" on the drug distribution conspiracy "is substantially different from the proof required for conviction on the [] RICO conspiracy," judicial economy supports severance.[4]  *Id.* at 400.  Although using curative instructions and instructing the jury to assess the evidence against each defendant separately would mitigate the prejudice to Sterngast, I find that a joint trial would create sufficient prejudice for me to exercise my discretion to grant Sterngast's motion for a severance.  *See United States v. Shkreli*, 260 F. Supp. 3d 247, 256 (E.D.N.Y. 2017) (granting severance when there is a "serious risk that the jury would be prevented from making a reliable judgment about guilt or innocence even with limiting instructions by the court").  Further, because Sterngast is likely to raise objections to the predicate acts evidence and its admissibility against her, severing the trials obviates the need for me to make numerous rulings throughout trial regarding the admissibility of certain evidence of limited relevance to Count Three but would be clearly admissible against Teague and Sanders,

---

[3] This concession also does not factor in the likelihood that Sterngast would move *in limine* to preclude some or all of the predicate acts.

[4] I note that granting severance would also eliminate the need for me to limit the predicate act evidence because of a joint trial with Sterngast, thereby eliminating a prejudice to the Government.

and thus promotes judicial economy. *Id.* at 256–57 ("Constant objections . . . will disrupt the flow of the trial and increase the length of the trial, will likely confuse the jury in what is already a complex case. . . . Thus, the court finds that from a trial management perspective and to prevent substantial prejudice and jury confusion, severance is warranted.").

For these reasons, I find that severance is warranted for Sterngast only and Sterngast's motion for severance is GRANTED.

### IV.    Conclusion

Because there is a substantial risk that Sterngast will be prejudiced resulting in a serious risk that a joint trial would compromise her trial rights, Sterngast's severance motion is GRANTED.  Because Sanders will not suffer prejudice from a joint trial with Teague, Sanders' severance motion is DENIED.

A pretrial conference will be held on July 21, 2026.  Counsel for Teague should be prepared to discuss whether or not he intends to file pretrial motions on behalf of his client, and the parties shall be prepared to discuss setting a trial dates in the first or second quarter of 2027. Time will be excluded between July 10, 2026 and July 21, 2026 to permit the parties to discuss when they are available for trial, potential pretrial dispositions, and for Teague's counsel to consider what, if any, pretrial motions he might file on Teague's behalf.  I find that granting the exclusion outweighs the interests of the public and the defendants in a speedy trial.

SO ORDERED.

Dated: July 10, 2026
         New York, New York

Vernon S. Broderick
United States District Judge